. T . Good morning, Your Honors. May it please the Court, Bobby Birchfield for Moen. I would like to reserve five minutes for rebuttal. You may. In Tackett, the unanimous Supreme Court rejects . . . Before we get to that, I just have a practical question. Is my understanding that this is about a 200-member unit? We're talking about 200 people? That's about right, Your Honor. We think about 210. Including today? Because it's an aging group. That's why I was asking. It was about 213 at the time of the trial court proceedings, and we believe it is around 210 or so now. I don't have a precise number for you, Your Honor. The benefits are costing about $140,000 a month. How many employees worldwide does Moen have? I do not know the answer to that, Your Honor. I apologize for that. Moen is a substantial company, but this is a significant . . . Booked on the accounting basis, this is over a $20 million liability for Moen. The unanimous Supreme Court rejected all inferences and rules of construction adopted by this Court in the Yard Man line of cases. The lower court here relied on those decisions 17 times. Just as important, the Supreme Court set forth the correct legal principles to govern decision in these cases. First, among others, it said ordinarily contractual obligations will expire when the contract expires, and general duration clauses should be respected. It also said courts should not construe silence or ambiguity to create lifetime promises. And the Court quoted with approval this Court's decision in Sprague, which held that an intent to vest must be stated in clear and express language. Taken together . . . You often . . . your brief regularly says that the new rule after Tackett is clear and express language. Is that the position you take? Your Honor, we believe that taken together, what the Court has . . . all the points the Court made, silence and ambiguity cannot create vesting, the clear and express language quotation from Mowen, the quotation from Lytton, all of that taken together indicates that there must be some clear manifestation of intent. My position would be, reading the opinion, a clear and express statement is necessary. But as Judge Duggan put it in the Reese case, which we submitted as supplemental authority, some clear manifestation must appear on the face of the agreement. The Court is certainly demanding more than what Yard Man required, which is vague inferences of intent. Isn't there a line between vague inferences and clear and express? I mean, normal contract interpretation certainly is a lot more than vague inferences, but it doesn't usually require clear and express. I mean, we do contract interpretation all the time, which is not clear or express, but you derive it from the language, I agree with you, from the language of the contract. But in normal contract interpretation, you don't go as far as clear and express do you? Well, Your Honor, here you have ordinary principles of contract interpretation apply insofar as consistent with congressional, with federal labor policy. And that federal labor policy, as the Supreme Court discussed at length in Tackett, must take account of Congress's decision not to vest welfare benefits. So you don't start really from a neutral position. You start from a position where Congress has said that welfare benefits, such as retiree health care, are not vested. So something has to be in the agreement to overcome that baseline where benefits are not vested. I'm struggling with that argument, because what Congress said is that we will vest pension benefits. ERISA requires certain pension benefits to be vested, and you cannot take those away from people. But just because it did not include in the pension section and the pension vesting requirements health and welfare benefits doesn't mean that they can't be vested by agreement. Exactly, Your Honor. They certainly can be vested by agreement. But they're not barred by the law from being invested. I'm not seeing that your argument that pension vests and these are not vested works to get you where you're going. And that's why I'm struggling. I'm struggling with the citation to Litton, too. Answer that one first, and then let's talk about Litton, because I'm concerned about your analysis. Sure. There were two holdings in Litton, Your Honor. The first was that the case was arbitrable for disputes that arose under the collective bargaining agreement. And that took account of the strong national policy in favor of arbitration. The second holding in Litton, however, was that the seniority system did not continue beyond the contract. And that's where the court made the statement that some sort of clear statement was necessary to continue it beyond the contract. And that's what the Supreme Court cited in Tackett, and we must assume, I think, that the Supreme Court viewed that second holding as the one that's pertinent to these cases. I've looked pretty closely at Litton and Tackett both, and Litton says expressly that the source of constraints upon the employer after expiration of a collective bargaining agreement includes a duty, and this was its preliminary holding, that may arise from the express or implied terms of the expired agreement itself. So Litton stands for the proposition that you look at the entire agreement and what may be either expressed or implied from it can constrain that duty. You know, it went on to say that contractual obligations will cease in the ordinary course upon termination. Exactly, I agree with your explanation of that. But then it says exceptions are determined by contract interpretation. Rights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement. So don't we have to see what vested in the agreement? Isn't that the issue? Your Honor, those passages we read are in Litton, but that's not what the Supreme Court chose to quote in this context. What the Supreme Court chose to quote is... Well, I think the Supreme Court in Tackett did. It quoted that and continued... You want to tell... You want to look at Tackett specifically? I've got it right here, Your Honor. Because I think it did. It says, indeed we have already recognized that, quoting Litton, a collective bargaining agreement may provide in explicit terms that certain benefits continue after the agreement's expiration. Excuse me. So that's what the court chose to quote here as relevant in this context. A paragraph above it, it quoted Sprague as contradistinguished from the Yardman rule in which the court held that clear and express language was necessary, that a clear manifestation was necessary to find the benefits existed, but was not necessary to prove their duration. It quoted Sprague as indicating clear and express language was necessary to prove their duration. I'm looking at page 937 of Tackett. I've got that, Your Honor. It quotes the Court of Appeals similarly failed to consider the traditional principles that contract obligations will cease, which you and I have already agreed on. Cite to Litton explanation. That principle does not preclude the conclusion that the parties intended to vest lifetime benefits for retirees. Indeed... Indeed, they may have in explicit terms that contract. So the key is when a contract is silent, the court may not infer that they intended the benefits to vest, but the parties may agree to it under Litton by express or implied conclusions from the contract. Well, Your Honor, you and I may... I may not come to an agreement on this, but... Counselor, can I enter this conversation and see if I can... First of all, I think you have to acknowledge there is a little tension, right? I mean, it would be a little strange for the court to be deriding us for creating this clear statement thing going one direction and then to suddenly say, well, what comes out of it is a clear statement rule coming the other direction. I think the other thing I would say is when you say clear statement rule to judges, I mean, that implicates things like the rule for abrogating sovereign immunity, which really requires express language. I mean, that's what that rule means. And I don't think that's what's going on here. I don't even think that's what Sprague did. And I think... I still think it's possible to have inferences and implications. I mean, the canons that we deploy by comparing language in one section for another, those are all inference and implication-based canons. So I think that has to be part of what we're doing. And, you know, so I think the closest you get to a clear statement rule is the idea that it's odd to, in a three-year agreement, have a clear statement rule. That's just an inference. That's not normally what you see. If I may, Your Honor, let me address what's going on in these specific collective bargaining agreements. The plaintiffs rely upon the term continue. The term continue is used for pre-1996 retirees. Take, for example, a 1991 retiree, which as a past pensioner, the CBA said continued coverage will be provided. That same language was repeated in every CBA after she retired, 1991, 1996, 99, 02, culminating in paragraph 130C of the 2005 CBA. What the parties were doing here was not vesting the benefits. They were re-upping them as a matter of negotiation in each successive contract. Why couldn't you interpret that language based on custom and usage and the other thing that Williston tells us to look to between the parties as doing two things, placing and memorializing an existing agreement between the parties that those people who have already retired are vested and saying to the people who will retire during the course of that contract that when you retire, you too will be vested. So it's a memorialization of what Tackett and Litton tells us are rights which accrued or vested under the agreement which survive termination of the agreement. Your Honor, I don't think that makes sense in the context of these agreements with all due respect because the retirees, the people who retired before 1996, if they had their time, they retired, there was no reason whatsoever to include them as they explicitly are included in the 1996, 99, 02, and 05 agreements. You do labor law. If you have an agreement between parties that is not memorialized or mentioned in the ongoing collective bargaining agreements, isn't what happens is one party says that deal's over. We didn't put it in the new collective bargaining agreement. Hence why collective bargaining agreements routinely recite over and over and over the same thing across years of agreements because they're memorializing the deal that's already been cut. And that's exactly my point, Your Honor, because if it was already memorialized, if it was already in the collective bargaining agreement at the time they retired, they would not need to reiterate it time after time as they did. Counsel, I think your time's expired. Do we need to thrash this any further? Unless there are any further questions, I reserve five minutes for rebuttal. Thank you. Thank you, Counsel. You'll have your five minutes for rebuttal. May it please the Court, I'm Joyce Goldstein on behalf of the UAW and the retirees, the retirees. I'd kind of like to change the focus a little bit from the conversation that you just had with Mr. Birchfield and talk about the plant closing agreement. I really would like to focus my argument on the plant closing agreement. Of course, I'm happy to answer any questions that you have about the history of the collective bargaining relationship and if I've got time to respond to some of Mr. Birchfield's comments. But I really want to devote my time to the plant closing agreement because I think that worst case for my clients, even if the retiree benefits had not vested before, which we of course believe that they did vest, that the plant closing agreement itself conclusively establishes that the parties intended there to be lifetime retiree health benefits. So what's your response to their point that the plant closing agreement incorporates the last CBA? Ah, the plant closing agreement. Let's look to the language of the plant closing agreement. I mean, let's take it out. The plant closing agreement is short. It's six pages. Just like Tack-It was six pages. It's short. This was the last agreement that the parties were ever going to negotiate. This was the end. They wanted to resolve all of their issues with was going to be the end of their relationship. This was a divorce. This was it. The end. And that's what the plant closing agreement does. So if you look at the plant closing agreement and you look in the second paragraph of it, it says, all terms and conditions of the 2005 to 2008 collective bargaining agreement shall remain in effect until all bargaining unit employees cease working at the facility. Great. It extends the collective bargaining agreement to the last person works. And at that time, the collective bargaining agreement shall cease to exist. And now comes the key language. Except for items as agreed to in this agreement. That's what the next five pages of the agreement does. That's what the plant closing agreement is all about. It's then setting out the exceptions. And of course right after that, the next sentence speaks to employees electing to retire will need to make application prior to their last day worked unless incapacitated, which of course was very important because there were people who were going to be retiring under this plant closing agreement who wanted to make sure that they were going to get their benefits on the way out the door, particularly their retiree health benefits. So that what the parties did in the plant closing agreement, and that's why I say, you know, we can make this case easy for the Sixth Circuit because I understand there are a lot of cases that are out there and regarding retiree health benefits that are established under collective bargaining agreements. And in no way am I in any way diminishing the strength of what I believe are cases on the collective bargaining agreements. But this case is easy because all you have to do on this one is look at the language of the plant closing agreement. It creates an exception. Okay, well maybe I'm just not following this. So you've got the language that says health care and related benefits shall continue, and it says for all retirees and spouses as indicated under the collective bargaining agreement. So if you weren't vested under, I mean, I know you're not saying, you're not discounting the possibility they were vested under the CBAs, but this argument only has meaning if they weren't, okay, right? Because if they were already vested, who cares about the plant closing agreement? You only need to win once, right? Well, yes and no. As Judge Strange said, I think retirees and collective bargaining always want to make sure that their benefits are there. I mean, it's kind of like this court. Tell me this. You're either saying you win independently under the plant closing agreement or not. I thought you were starting by saying don't worry about the CBAs. We win independently under the plant closing agreement because that by itself creates the vested right. That's your point, isn't it? That's correct, Your Honor. Okay, so I'm just trying to figure out how that works if when it defines the health care and related benefits continuing, it says as indicated under the collective bargaining agreement. Right, because what happened was, what's incorporated in Article 17 from the collective bargaining agreement, which is referenced, is the level of benefits. Those are the benefits because every time when somebody retired... It just says shall continue, though. Exactly. The benefits that people got were frozen on the day they retired. That's what the history of the collective bargaining relationship was all about. That is what all of those past agreements did, and then that was again memorialized in the 2005 to 2008 agreement. It said whatever anybody retired under at the time they retired from active employment, so there was a provision that talked about employee health benefits. That was the level of benefits, whatever your deductibles were, whatever coverage you had. That's the bundle of benefits that you had when you became a retiree. So tell me, under your reading of the plant closing agreement, I know this is not how you read the reservation of rights clause in the CBAs, but just hypothetically, it was quite explicit. It said, I know we're continuing benefits for retirees, including those who have already retired, and it just very explicitly said, you know, health care costs rise, sometimes out of control. We reserve the right to lower the amount of coverage or to increase the premium. So let's just say it had been very explicit in the CBAs. There was no reservation of rights clause. That's why I'm saying it's a hypothetical. Okay. I'm sorry. This is a hypothetical. Yes. Let's say the CBA had clearly, the last CBA had clearly reserved the rights to change the nature of the health care benefit, even for those people that already retired. Are you saying that under your reading of the plant closing agreement, it wouldn't even matter? It would still create a new vested right without any reservation of rights possibility? It's a little bit hard to answer as a hypothetical without actually seeing the language that you would be talking about. I'm saying everything about the case is exactly the same, except that the reservation of rights clause in the CBA is more explicit and would require someone to say clearly they're reserving their rights to change the health care benefits for retirees. But because I'm trying to, I'm trying to isolate exactly what it is about the plant closing agreement that independently vests, and that would seem to be a way to show it. Right. Because the plant closing agreement has no expiration date. It's hard, it's hard to answer the hypothetical if there was a reservation of rights clause within the retiree benefits section of the CBA, would that have been adopted as part of this language? I mean, it's hard, I don't know how to answer that. Perhaps it could have been, but those, of course, are in our facts. What we do have is we... I think that for my follow-up question, then, I think isn't surprising if, if let's not even rely on reservations of rights clause. Let's just leave that to the side, even though there is some language. If for whatever reason one reads TACIT to say, you know, these CBAs just don't do the trick. They just don't create the vesting. I'm just struggling how to get a different answer. Right. Because, Your Honor, because the CBA in TACIT was a CBA. It was a three-year agreement, a five-year agreement, whatever it was. It wasn't a plant closing agreement. So when you talk about in TACIT, for example, general durational clauses and that sort of thing, well, we don't have one of those in the plant closing agreement. If, in fact, that the parties only limited the retiree health benefit to the collective bargaining agreement, then they wouldn't have put this in the exceptions. They wouldn't have needed to put it in at all. Because the second paragraph of the agreement where we started already extended the terms of the collective bargaining agreement to the last person stopped working. That was already done. So what was happening in the exceptions is it was saying, okay, these benefits shall continue, shall continue, and shall continue. I'm sorry. When was, in fact, the last person working a few? Oh, what? It was in December of 2008. So they'd negotiate the plant closing agreement. So in that sense, so until the last person working is only about another nine months from the date of the agreement. That's correct. So it was essentially contemporaneous. But at least that portion did go beyond the closing date of the CBA, which was what, June? In June. June of 2008. And so at least one reading of the language on the last page is it continues as indicated under the CBA until the last person quits working. Ah, but then you don't need an exception. Then it ended after the second paragraph of the agreement. And then we're back to the, you know, do you have belts and suspenders and what do you take from that? But my, okay, I understand that. But on the belt and suspenders? I understand that part, but the second part then is continuing as indicated under the CBA. The CBA itself went on for several months after this agreement. Is that what you want to say is the as indicated under the CBA in that last page relates to the level and nature of the benefits, but does not relate to the time of the benefits which the CBA would control? Exactly. Because the duration of the benefits under the CBA, we're not even talking about that. We've now accepted that. But there's no place in the plan. No, there's not something that says, and we're not talking about duration, we're balancing page six against page one. Well, I don't think that there is a, that there is any inconsistency. And that's exactly what the Seventh Circuit did. And I just want to draw the court's attention to. I mean, the Seventh Circuit did. The Seventh Circuit did in the Zielinski case and in Tenney, both. I mean, it's interesting because the Seventh Circuit, you know, no great friend of retirees in these retiree health cases. I mean, we know the Seventh Circuit put that proverbial thumb against the retirees, unlike what the Sixth Circuit had been doing in Yardman. Notwithstanding that, even in the Seventh Circuit, you have two cases involving plant closing agreements, two. And what did the Seventh Circuit do? Even though they put the thumb on the scale against the retirees under normal, as Judge Posner described, short-term collective bargaining agreements, three-year agreements, he said that it was entirely different analysis when there was a plant closing agreement. Because... I think you're completely right. It's just a question of what the plant closing agreement says. But can I ask you a question? Because you, this has always baffled me. And I've had the bad luck of getting one case in this area after another. The, you know, so Sprague is this case where it's unilateral creation of the benefit. So it's healthcare benefits, no different from these in general. And I've just, I've never understood why we shouldn't think about these cases at a minimum just the same. In other words, it really shouldn't make a difference in terms of the interpretive canons and principles, whether it grows out of a CBA or out of a unilateral employment of a creation of a plan by an employer. But if we were going to have a difference, I would have thought it would be a difference that would have been favored the employees in the setting where they have no say. I mean, they don't get to negotiate. They don't have any representative. And so I've just never understood that. But I guess maybe my real question is, should we, do you think it's fair to say whatever we do, we should do the same in both? Or should there be different rules for the collective bargaining setting, which so far have been rules that favor employees more there than they favor them in the unilateral setting. I've just never quite gotten this. So, Your Honor, let me just say this. I mean, Sprague is, it is a different situation. And, you know, I guess to your question of should collective bargaining relationships be evaluated differently, I think they should be. They are different because they are negotiated. Employees should get more benefits when they have a representative than employees that have no representative? No, it's not a matter of more or less. It's a matter of understanding the context. So if you have a context of the benefits arising from a collective bargaining agreement, that's different than the benefits arising unilaterally. Because in Sprague, I mean, General Motors could either grant the benefits or not grant the benefits. They created all the documents. It's all, it was all unilateral. And importantly in Sprague, Sprague was not analyzed at base as a contract case. It was, it was analyzed as an ERISA case. It's not a contract. Because it wasn't, exactly, it wasn't a contract. So you didn't need to get to what was the intent of the parties. The heart of what TAC-IT is about is what did the parties intend? What did the parties intend? And here we have evidence over the decades, which, you know, we can talk more about. We have the only time that this company ever, ever messed with the retiree health benefits was in 1983. And it led to a strike and a lawsuit. The end of which was a settlement. But from the union's perspective, the retirees were made a language, the same language continued on, continued on, continued on. That's the history of the collective bargaining relationship. That matters. That's very different than a Sprague case. That's different. You have to look at what's the context. I think it's a good point. I guess the only way it makes a difference is if you assume when it's unilateral, the employer presumptively is always going to give as little as they can. In other words, the presumption is against generosity. And may speak truly of some employers. I'm not sure it speaks truly of all employers, right? But the important part about TAC-IT, your honor, is no thumb, no presumption. The court did not, in my view, when I read TAC-IT, I didn't read it as saying Sprague got it right. They did quote and cite Sprague. I mean, ah, they cited Sprague to distinguish how all over the map in the Sixth Circuit was in looking at retiree health benefits. I firmly disagree that the court said, oh, Sprague is now the new rule for everything. I just think it was cited as an example in that paragraph of saying, and look, the Sixth Circuit said this here, said this there. I don't think that that was about adopting Sprague for all purposes for all time. I strongly disagree. And I don't know, is the pension plan in the record? I know it's cited and quoted by each of you at different points, but the pension plan itself that covers these retirees is not in the record or is it in the record? That's a good question, your honor. Parts of it all. Yeah, there, you know, certainly we obtained it in the course of discovery. It was, you know, we had it, you know, in documents, whether anyone ever cited it or used it. It's been cited and quoted a couple times. I was just curious to look at the whole thing if it was there. Yeah, I mean, one of the things just to note about the pension, and I see my time's up, but if it's okay to just respond on this one thing, is that it's important to note, too, on the retiree health benefits that there were two types of retiree health benefits that were provided over the decades. One was the provision of a plan of health care benefits, a plan, and the other was there was Medicare Part B reimbursement. And the Moen announced the elimination of all benefits in 2013. It was eliminating both, both the provision of a plan and the Medicare supplement, the Part B supplement. It's interesting because that Medicare B reimbursement has always been paid in the pension check, and although, you know, they announced that they were going to stop that also. In the 1983 case, Moen did not, I mean, what reimbursement piece, and at the time said the reason we're not doing it is because we view it as a vested right, it continues beyond the contract and so on. Moen's never explained why that changed now in 2013, but they had provided it as part of the pension and continued doing it even during the strike. Okay, thank you, counsel. Your time's expired. Mr. Birchfield, you have your five minutes for to go first to Judge Sutton's question about the pension plan. It is in the record, it is at document 52-22, and at page 5641, which is what we quote on page five of our reply brief, it says that pension benefits are a series of monthly payments for the life of the participant. Uh, Ms. Goldstein, excuse me, but that's within the agreement itself, but it is. I've struggled with the distinction you seek to draw that that you don't have the lifetime word in health and welfare because ERISA requires that agreement to say that the benefits are for life. They must, by law, do that. The joint and survivor annuity provisions in that plan document are required by law to be included in it, so I'm struggling with why a requirement at law that you must list this in a plan document would allow you to make a converse argument about health and welfare benefits, which don't have the same requirement. May I make two points? The first point is that when the parties, these parties, settled their dispute on the 1983 Stanadyne case, they settled it in early 1992, the language they used to deal with the welfare benefit, the health care benefits was, quote, for as long as any Moen retiree, as defined, is receiving monthly pension. That is lifetime language. We don't have anything like that in the CBAs here, and that is these parties. My second answer to your question, Your Honor, is that in the closing effects agreement, the clause that Ms. Goldstein relies upon to create vesting also includes the pension benefits, which, as we already know, were already vested, so a more logical reading of that closing effects agreement is, as Judge Sutton suggested, that it is for the duration of the collective bargaining agreement as extended under the terms of the collective bargaining agreement. It doesn't add anything to the vesting issue. Would that not be if your argument is presuming Tackett's analysis, which talks in terms of eligibility, but if, in fact, this is a durational provision in the plant closing agreement, then, in fact, it does tell you that it lasts through time and may do so. Well, Your Honor, our position, as we've stated, is that the closing effects agreement merely continued the benefits as provided in the collective bargaining agreement. Then why did you pay them for five years after the collective bargaining agreement closed? Well, Your Honor, I think it was a business decision that when the company and the record supports this, it's cited in a footnote in our briefs, when the company saw the Cadillac tax on these generous benefits coming down the road and when the cost of the benefits got to be significant, the company made the decision. It could have made it earlier, it could have made it later, but the question before the court is, did the company have the right to make that decision? And the question before the court is, the relationship engaged in between the parties by custom and practice, does that five years indicate that they understood the custom and practice and rule to be, we have to pay this? Well, Your Honor, I think the precedents in this court indicate that the fact that you have not invoked the right in this context doesn't mean that you waive that right. But waiver is different from indicia of intent, and that's what we're looking for here. I think we've got to look through, as Williston tells us, what does the language itself say? What do the customs and practices of the parties indicate to us? It's almost a totality of the circumstances. Your Honor, I read those statements from Tackett as being criticisms of the rules of construction created by Yard Man, that the court did not base those on customs and practices or any analysis of what was actually going on in the industry, and that's why those were invalid. I don't think the court is saying, is inviting the court to look in every case to have a trial on custom and practices in the industry. I hope that's not what the court is saying. I would agree with you. The only thing that they look to is the extent that Williston suggests that we do so. It's the ordinary contract. I think we would agree. It's the ordinary contract interpretation rules. Your Honor, against the background of the court statement that silence and ambiguity should not lead to an inference of benefits, against the court statements about clear manifestation of intent, against the court citation of Sprague, may I speak for a moment about the reservation of rights clause, which came up? I'm out of time, and I ask the court's indulgence on this. Well, you're presiding. You're presiding. I mean, if either one of you wants to hear it, that's fine. I'm satisfied at this point. I'm fine. I understand. Thank you, Mr. Birchfield. Thank you very much. The case will be submitted. The remaining